By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to
6th Cir. BAP LBR 8024-1(b).  See also 6th Cir. BAP LBR 8014-1(c).

File Name: 21b0007n.06

# BANKRUPTCY APPELLATE PANEL

## OF THE SIXTH CIRCUIT

---

IN RE:  DAVID AUSTIN TOLLIVER,

 *Debtor*.

---

WLP CAPITAL, INC.; BRIDGE CAPITAL LENDERS, INC.; TRANSFAC, LLC,

     *Plaintiffs-Appellees*,

 *v*.

DAVID AUSTIN TOLLIVER,

     *Defendant-Appellant*.

No. 20-8021

---

Appeal from the United States Bankruptcy Court
for the Middle District of Tennessee at Nashville.
No. 3:19-bk-07024; Adv. No. 3:20-ap-90013—Charles M. Walker, Judge.

Decided and Filed:  December 20, 2021

Before: CROOM, GUSTAFSON, and PRICE SMITH, Bankruptcy Appellate Panel Judges.

---

## COUNSEL

**ON BRIEF:**  Robert R. Carl, Sye T. Hickey, BAKER, DONELSON, BEARMN, CALDWELL & BERKOWITZ, PC, Knoxville, Tennessee, for Appellees.  David Austin Tolliver, Franklin, Tennessee, pro se.

---

**OPINION**

---

JOHN P. GUSTAFSON, Bankruptcy Appellate Panel Judge.  This appeal arises from an adversary proceeding brought by WLP Capital, Inc., Transfac, LLC, and Bridge Capital Lenders, Inc., (collectively "WLP") seeking to have a $1,313,011.75 pre-petition judgment debt ("Utah Judgment") owed to them by David Austin Tolliver ("Tolliver") declared nondischargeable as a debt for (i) willful and malicious injury, and/or (ii) money obtained by false pretenses or a false representation.

On a motion for summary judgment, the bankruptcy court determined that the Utah Judgment was based on "fraudulent actions and forged documents" and granted WLP a judgment against Tolliver on June 26, 2021, finding the entire amount of the Utah Judgment nondischargeable "under 11 U.S.C. § 523(a)(2) and/or (a)(6)[.]" (Order Granting Summ. J. at 4, Adv. Proc. No. 20-90013, ECF No. 63.)

The Utah Judgment includes factual findings regarding Tolliver's actions.  As will be explained infra, those findings are binding in Tolliver's bankruptcy proceedings under collateral estoppel principles and the *Rooker-Feldman* doctrine.  These binding facts conclusively establish that a portion of the damages awarded in the Utah Judgment are excepted from Tolliver's discharge.  They do not, however, conclusively establish that the entirety of the damages may be excepted from discharge under § 523(a)(2) or (a)(6) at the summary judgment stage of the proceedings.  For the reasons set forth below, the Panel AFFIRMS in part, VACATES in part, and REMANDS for further proceedings consistent with this opinion.

**ISSUES ON APPEAL**

On appeal, Tolliver challenges the use of the Utah Judgment to preclude the relitigation of certain facts.  He also argues that the bankruptcy court erred in declaring the underlying debt from the Utah Judgment nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or (a)(6).

**JURISDICTION AND STANDARD OF REVIEW**

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Middle District of Tennessee has authorized appeals to the Panel, and no party has timely filed to have this appeal heard by the district court. 28 U.S.C. § 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (citation omitted). A bankruptcy court order granting summary judgment is a final order for purposes of appeal. *Menniger v. Accredited Home Lenders* (*In re Morgeson*), 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007). "A determination of dischargeability is [also] a final order." *Doe v. Boland* (*In re Boland*), 596 B.R. 532, 536 (B.A.P. 6th Cir. 2019) (citation omitted).

A grant of summary judgment is a conclusion of law, reviewed de novo, as is a dischargeability determination under 11 U.S.C. § 523. *In re Morgeson*, 371 B.R. at 800; *Ewers v. Cottingham* (*In re Cottingham*), 473 B.R. 703, 705 (B.A.P. 6th Cir. 2012) (citations omitted). A *Rooker-Feldman* determination and the application of collateral estoppel are also questions of law that are reviewed de novo. *McCormick v. Braverman*, 451 F.3d 382, 389 (6th Cir. 2006) (citation omitted); *Spring Works, Inc. v. Sarff* (*In re Sarff*), 242 B.R. 620, 623 (B.A.P. 6th Cir. 2000) (citing *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 461 (6th Cir. 1999)). "Under a de novo standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *In re Morgeson*, 371 B.R. at 800 (citing *Treinish v. Norwest Bank Minn., NA.* (*In re Periandri*), 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001)).

"Granting summary judgment is appropriate where the moving party has carried its burden of showing that the pleadings . . . in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." *Church Joint Venture, L.P. v. Blasingame* (*In re Blasingame*), 986 F.3d 633, 638 (6th Cir. 2021) (internal quotation marks and citation omitted).

When the moving party has met its initial burden, the adverse party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986) (internal quotation marks and citation omitted). A genuine issue for trial exists if the evidence is such that a reasonable fact finder could find in favor of the nonmoving party. *Id.* at 250. "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative evidence [] to support" its position. *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) (citing *Anderson*, 477 U.S. at 256).

"The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). "When parties file cross-motions for summary judgment, 'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (other citations omitted)).

This Panel does not have the responsibility of searching the record sua sponte for genuine issues of material fact. Rather, the nonmoving party must "designate" such "specific facts." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992) (citing Fed. R. Civ. Proc. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548 (1986)). Tolliver's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment consists of twenty-nine exhibits and totals more than 800 pages.[1] "To try to review the complete collection of exhibits, or to read each line of every page of all submitted depositions—much of which may not even be relevant to the real issues at hand—this represents to courts at both the trial and appellate levels an unrealistic ideal, an unaffordable luxury." *Id.* at 406. It is true that "we hold pleadings

---

[1]The Designation of Record and Relevant Lower Court Documents contain over 800 pages of material. On appeal, Tolliver alone produced about 100 pages of unorganized documentary evidence, which are attached to his reply brief. For example, in his reply brief, he does not provide any summary of facts and the entirety of his "brief" is a little over eleven pages. This Panel does not have a duty to comb through the attachments to discover evidence creating a genuine issue of material fact. *Guarino*, 980 F.2d at 405-06.

filed by a pro se litigant to less stringent standards than formal pleadings drafted by lawyers." *Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007) (internal quotation marks and citation omitted). However, this "leniency granted to pro se [litigants] . . . is not boundless." *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (citation omitted). While Tolliver's failure to designate a "concise" statement of "material" facts, as required by Federal Rule of Civil Procedure 56(c) and Middle District of Tennessee Local Rule 56.01(b), provides a possible basis for denial of the appeal, this Panel has nevertheless undertaken an examination of the exhibits filed by both parties, which mainly consist of documents from the Utah state court proceedings.

## FACTS[2]

At all relevant times Tolliver was a member/manager of Ashtin Transport, LLC, ("Ashtin") a Texas limited liability company. (Ruling Adopting Special Master's Report and Order of Sanctions at 4, Adv. No. 20-90013, ECF No. 1-2 [hereinafter "Sanctions Order"].)[3] WLP are factoring companies that buy discounted accounts receivable in exchange for immediate payment and then attempt to collect the full amount. (State Ct. Compl. at ¶¶15-19, Adv. No. 20-90013, ECF No. 1-1 [hereinafter "Utah Compl."].)

On November 17, 2016, WLP entered into an agreement ("Receivables Agreement") with Ashtin. (*Id*. at ¶20.) WLP agreed to advance an amount that would not exceed one hundred seventy-five thousand dollars ($175,000.00) for accounts submitted by Ashtin. (*Id.* at Ex. 1.) Pursuant to the Receivables Agreement, WLP took a security interest in Ashtin's assets. (*Id.* at

---

[2]The record in this appeal is found in the electronic dockets of *In re Tolliver*, Case No. 3:19-bk-07024 (Bankr. M.D. Tenn.), *WLP Capital, Inc. et al. v. Tolliver*, Adv. Case No. 3:20-ap-90013 (Bankr. M.D. Tenn.) and *Tolliver v. WLP Capital, Inc. et al.*, BAP Case No. 20-8021 (B.A.P. 6th Cir.). Citations to the electronic docket will identify the document by name, indicate which case number's docket the document is contained within and the ECF number for the docket entry. For example, references to the docket in the adversary proceeding *WLP Capital, Inc. et al. v. Tolliver*, Adv. Case No. 3:20-ap-90013, appear as (Adv. No. 20-90013, ECF No. ___). References to the docket in the Debtor's chapter 7 bankruptcy, appear as (Bankr. No. 19-07024, ECF No. ___).

[3]As will be discussed in more detail below, in issuing its sanctions order, the state court struck all of the defendants' state court pleadings and dismissed all of their defenses and counterclaims with prejudice. *See* (Sanctions Order at 21, Adv. No. 20-90013, ECF No. 1-2.) By virtue of this action, WLP's allegations in the Utah Complaint, "other than statements of the amount of damage," were deemed admitted. Utah R. Civ. P. 8(d); *Fratto v. Hensley*, No. 20080473-CA, 2009 WL 1089548, at *1 (Utah Ct. App. April 23, 2009) ("Furthermore, because the district court struck Defendant's answer, Plaintiff's allegations of negligence and causation were deemed admitted and the only issue remaining to be determined at the hearing was damages." (citing Utah R. Civ. P. 8(d)); *see also*, Fed. R. Civ. P. 8(b)(6). As such, the Panel will reference the Utah complaint in setting forth the facts of this case.

¶21.) On November 18, 2016, WLP perfected their security interest under the Receivables Agreement by filing a financing statement with the Texas Secretary of State. (*Id.* at ¶31.)

On or about February 10, 2017, Ashtin reconstituted itself in Tennessee. (*Id*. at ¶54.)

On February 24, 2017, WLP and Ashtin entered into a second agreement ("Future Receivables Agreement") under which WLP would purchase Ashtin's future accounts. (*Id*. at ¶34.) The Receivables and Future Receivables Agreements provided for liquidated damages and other costs and fees. For example, the contracts have "Missing Notation Fee," "Invalid Invoice Fee," "Payment Conversion Fee," an obligation to repurchase any invoice after ninety days defined as a "Chargeback Account," and an obligation to repurchase all submitted invoices that were the subject of an "Event of Default." Tolliver personally guaranteed the obligations under these agreements. (*Id*. at ¶¶29, 41.)

On May 17, 2017, Ashtin and WLP agreed to amend the Receivables Agreement to increase the maximum advances by WLP to five hundred thousand dollars ($500,000.00) for accounts submitted by Ashtin. (*Id.* at Ex. 1.)

After WLP learned of Ashtin's reconstitution in Tennessee, WLP filed financing statements with the Tennessee Secretary of State. (*Id*. at ¶59.)

On June 27, 2017, Tolliver filed false and unauthorized UCC financing statement amendments with the Texas and Tennessee Secretaries of State, purporting to terminate WLP's security interests. (*Id*. at ¶¶65-66.)

On July 6 and 7, 2017, WLP filed UCC financing statements in Texas and Tennessee that provided notice that Tolliver's attempts to terminate their security interests were fraudulent. (*Id.* at ¶68.)

Tolliver filed additional UCC financing statement amendments on July 10, 2017, by which he once again attempted to terminate WLP's UCC filings. (*Id.* at ¶69.)

WLP perfected their interests under the Future Receivables Agreement by filing a UCC financing statement with the Texas Secretary of State on July 19, 2017. (*Id.* at ¶42.)

On July 26, 2017, WLP filed an eight-count complaint in the Third District Court for Salt Lake County, State of Utah, Case No. 170904762 styled *WLP Capital, Inc.,* et al. *v. Ashtin Transport, LLC,* et al. (collectively, "State Court Defendants"). (*Id*. at 1.)

## I. The Utah Complaint.

WLP's claims mainly arose between December 2016 and May 2017 when Ashtin and Tolliver submitted certain invoices related to accounts with C.H. Robinson to WLP for purchase. At the time of submitting these invoices to WLP, Ashtin and Tolliver represented that Ashtin had delivered the loads referenced in the invoices. (*Id.* at ¶48.) In accordance with the Receivables Agreement, WLP wired money to Ashtin based on the submitted invoices. (*Id*. at ¶47.)

In June 2017, C.H. Robinson became delinquent on its invoices. (*Id.* at ¶49.) WLP contacted C.H. Robinson to collect payment on the invoices they had purchased from Ashtin. (*Id.* at ¶49.) C.H. Robinson stated that Ashtin never performed on the invoices Ashtin sold to WLP because C.H. Robinson had either removed Ashtin from the load or the load was cancelled. (*Id.*) Ashtin and Tolliver knew at the time of submitting the invoices that they had not performed the work referenced therein. (*Id.* at ¶51.) The amount of the invoices submitted was approximately $260,000.00. (*Id*. at ¶50.)

In their state court complaint, WLP asserted claims for: (1) breaches of contract; (2) breaches of the implied covenant of good faith and fair dealing; (3) breach of personal guarantees; (4) fraud; (5) unjust enrichment; and (6) a declaratory judgment. WLP's complaint focused on the submission of invoices, the State Court Defendants' attempts to prevent WLP from receiving payment on purchased invoices, and the unauthorized termination of WLP's financing statements. (*Id.* at ¶¶1-2.)

Tolliver and the other State Court Defendants, through counsel, filed separate answers to the Utah Complaint. All of the State Court Defendants asserted certain affirmative defenses and counterclaims. The Utah litigation continued for several months, during which time additional issues arose.

On January 31, 2018, WLP filed a motion for sanctions alleging that Tolliver and the other State Court Defendants produced bank records and correspondence during discovery that were forged. (Decl. of Christopher M. Von Maack [hereinafter "VM Decl."], Ex. 5, Order on Pls.' Request for Fees and Costs at 2, Adv. No. 20-90013, ECF No. 30-1.) On February 23, 2018, in response to WLP's motion for sanctions, the State Court Defendants filed an ex parte motion for emergency status conference, alleging that WLP were behind suspicious activity (e.g., computer tampering) occurring on Tolliver's computer, and that counsel for WLP had acted wrongfully by intimidating a witness. (Sanctions Order at 14.)

**II. The Utah Court's Findings at the November 1, 2018 Hearing.**

On November 1, 2018, the Utah state court held a hearing on the motion for sanctions and the motion for emergency status conference. (VM Decl., Ex. 2, Partial Tr. Ruling at 1, Adv. No. 20-90013, ECF No. 30-1 [hereinafter "Partial Tr. of Ruling"].) The state court began by noting it was going to address the factual basis for its conclusions as to the alleged bank records, the alleged defamatory letter, and the alleged computer tampering.

With respect to the bank records, the state court found that Tolliver produced forged bank records in order to reduce his liability by falsely claiming WLP reversed certain wire transfers based on the invoices submitted on behalf of Ashtin. (*Id.* at 5:5-6, 7:2-4, 8:3-8.) The court stated the following in regard to the bank records: "I can't conclude anything other than that the defendant has perpetrated this fraud on the Court" based on the "mountain of evidence to support that Mr. Tolliver was involved in something untoward, wrongful, potentially illegal with respect to these documents." (*Id.* at 7:21-22, 8:13-15.) The state court also found the alleged letter supporting Tolliver's counterclaim was forged and that Tolliver's claims of computer tampering lacked any evidentiary basis. (*Id.* at 9:8-23.)

After making these findings, the state court noted that Tolliver's forgery was egregious and warranted case-ending sanctions. (*Id.* at 9:25-10:5-19.) The court emphasized that its factual findings were final: "I have made those conclusions. You're not going to change my mind on that." (*Id.* at 10:24-25, 11:2-3.) However, before hearing from counsel for WLP and Tolliver, the court noted that when case-ending sanctions are imposed, the court strikes the

sanctioned-party's pleadings and then enters a default judgment. (*Id*. at 20:9-12.) In some cases, a hearing on damages is required. (*Id*. at 20:14-15.) The court then heard arguments from counsel on whether an evidentiary hearing on damages would be required after imposing case-ending sanctions. (*See id*. at 36:25-37:20.) The state court asked for additional briefing from all parties before deciding whether WLP should be required to prove their damages with proper evidentiary support. (*See id.* at 38.)

### III.  The Written Findings in the Sanctions Order.

On December 26, 2018, the state court entered its Sanctions Order. (Sanctions Order at 1.) The court set forth factual findings in the Sanctions Order based on the record and on the issues raised. (*Id.* at 4.) As with its bench ruling at the November 1, 2018 hearing, the court addressed its findings with respect to the alleged bank records, the alleged defamatory letter, and the alleged computer tampering and witness intimidation. (*Id.* at 14-15.) In its Sanctions Order, the state court also ordered that the pleadings filed by Tolliver and the other State Court Defendants be stricken and that a default judgment be entered. (*Id.* at 21-22.)

The state court found that Tolliver and the other State Court Defendants had forged bank records in order to reduce their potential liability to WLP. (*Id*. at 4.) In great detail, the court reviewed the bank records and found that the "evidence [was] overwhelming that Defendants (likely Austin Tolliver, as Principal of Ashtin Transport (Compl. 3)), engaged in wrongful and fraudulent (and likely illegal) conduct by altering bank records to make it appear that monies that he received from [WLP] had been reversed and thus not appropriately credited to his account." (*Id*.) For example, the state court found that the "face of the records" had noticeable differences, and "on at least one of the pages, a cursor can be seen on the page indicating that it was not an original bank record but was created at the moment somebody was on a computer screen." (*Id*. at 5-6.)

Based on the evidence, the state court determined that it was clear that this wrongful, fraudulent, and potentially criminal, conduct was intentional. (*Id*. at 6.) The court noted that the benefits from these alterations would go directly to Tolliver and the other State Court Defendants and ultimately reduce their liability. (*Id.* at 7, 17.) The court determined that the evidence was

abundantly clear that Tolliver and his fellow State Court Defendants intended to use forged bank records as evidence to support their claims and defenses. (*Id.* at 9-10.)

The state court then addressed the alleged defamatory letter. After carefully reviewing the letter, the state court readily found that the letter Tolliver relied on for his defamation claim was a forgery. (*Id.* at 11-13.) As with the forged bank records, the state court determined that the alterations to the alleged letter were obvious after considering the formatting and capitalization errors, the poor attempt at legal writing, and the affidavit filed by the attorney who first sent the original letter, disavowing issuing the letter in its altered form. (*Id.*)

The state court then addressed Tolliver's allegations that WLP tampered with his computer and engaged in witness intimidation. The state court found that Tolliver's claims lacked evidentiary support. The court found Tolliver's claim regarding his computer to be "highly suspicious," especially when considering that any determination of the veracity of his claims would have involved an inspection of Tolliver's computer, which the state court was prevented from doing since Tolliver falsely claimed that the FBI had seized his computer. (*Id.* at 14-15.)

The state court summarized its findings and applied them to established sanctions law as outlined in *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992). First, the court found there was "actual prejudice to [WLP]. Due to Defendants' wrongful conduct, [WLP] had to spend unnecessary time and money" defending the spurious claims. (Sanctions Order at 17.) Second, the state court found the forgeries were "the epitome of conduct directed to disrupt a judicial proceeding." (*Id.*) Documents had been created to be used as exhibits to support Tolliver's and the other State Court Defendants' claims, and to "thwart [WLP's] claims," which interfered with the judicial process. (*Id.*) Third, there was sufficient evidence to support finding a high degree of culpability since the evidence clearly supported "Defendants' intentional and active engagement in wrongful conduct to try to direct the outcome of a legal proceeding." (*Id.*) The state court emphasized that this "brazen type of conduct exhibited by Defendants is exactly the type of conduct that" the adversary system could not bear, and required the most severe type of sanction: case-ending sanctions. (*Id.* at 17-18.)

The state court held that Tolliver and the other State Court Defendants had engaged in three different improprieties: (1) creating the altered documents; (2) producing the documents; and (3) continuing to maintain a strategy of using the altered documents to advance their position after the integrity of those documents was called into question. The court stated that any one of these improprieties would merit severe sanctions.

For these reasons, the state court held that case-ending sanctions were "required in this case." (*Id.* at 18). The sanctions applied to Tolliver and the other State Court Defendants for engaging in fraud on the court. (VM Decl., Ex. 5, Order on Pls.' Request for Fees and Costs at 3, Adv. No. 20-90013, ECF No. 30-1.)

The state court struck the pleadings filed by Tolliver and the other State Court Defendants and dismissed their defenses and counterclaims with prejudice and entered defendants' default. (Sanctions Order at 21-22.) The court's entry of default meant that it would only be required to hold an evidentiary hearing on damages, and defendants would not be permitted to present evidence regarding their claims against WLP or assert any defenses. (*Id.* at 20.) The court also ordered that WLP would be awarded all of their reasonable costs and attorneys' fees in responding to the altered documents. (*Id.* at 21.) Lastly, the state court held that WLP were entitled to a declaratory judgment as prayed for in the complaint. (*Id.* at 22.)

On April 9, 2019, the state court held an evidentiary hearing on invoice-related damages alleged in the complaint. (Ex. 10, Evidentiary Hr'g, Adv. No. 20-90013, ECF No. 7-10.) Neither WLP nor Tolliver provided the bankruptcy court or this Panel with a full transcript of the state court evidentiary hearing. The evidentiary hearing transcript appears to consist of 133 pages. However, the record only reflects twenty pages of excerpts from the hearing. (*Id.*); (Ex. 6, Evidentiary Hr'g, Adv. No. 20-90013, ECF No. 45-6); (Appellant's Reply Br., Ex. 1, BAP Case No. 20-8021, ECF No. 11.)

During the evidentiary hearing, the state court declined to address WLP's Sixth Cause of Action, the fraud claim, for two reasons. First, "because the damages would be the same." (Appellant's Reply Br., Ex. 1 at 130:1-3, BAP Case No. 20-8021, ECF No. 11.) Second, because the court "had no intention of addressing punitive damages." (*Id.* at 130:2-3.)

The court stated that the monetary damages in the final judgment "shall be joint and severable."[4] (*Id*. at 130:11-13.) The court then asked WLP's counsel to prepare an attorneys' fee affidavit and a draft of the judgment and send it to Tolliver's counsel. (*Id.* at 130:16-20.) The state court gave Tolliver's counsel fourteen days to respond and then asked Tolliver's counsel to submit the proposed judgment to the court. (*Id.* at 130:20-21.) The court stated it would enter the final judgment after making any modifications it deemed necessary, and at that point there would be a "final judgment, a final appealable judgment." (*Id.* at 130:21-25.)

On June 26, 2019, the state court entered four separate orders in the case between WLP and the State Court Defendants. In the first, a "Ruling And Order Regarding [WLP]'s Damages," the court incorporated the Sanctions Order and awarded WLP damages of $945,417.21. (VM Decl., Ex. 4, Ruling and Order Regrading Pls.' Damages at 1-3, Adv. No. 20-90013, ECF No. 30-1 [hereinafter "Damages Order"].) The court stated that the judgment "shall be joint and severable, as stated in the December 26, 2018 Order. In other words, the personal guarantors—Austin and Billy Joe—are jointly liable for Ashtin's obligations here for the reasons stated in the Court's December 26, 2018 Order." (*Id.* at 4.) The state court dismissed WLP's "other causes of action." (*Id.*) This order of dismissal included count six of WLP's complaint, the cause of action for fraud.

The second order the state court entered on June 26, 2019, was the "Order On Plaintiffs' Request For Fees And Costs." (VM Decl., Ex. 5, Order on Pls.' Request for Fees and Costs, Adv. No. 20-90013, ECF No. 30-1.) In this order, the court awarded WLP attorneys' fees and costs as a sanction for the defendants' fraud on the court. The state court awarded WLP attorneys' fees of $295,490.76 and costs of $72,103.78, for a total sanction of $367,594.54. (*Id.* at 10.) The state court recognized "the unique facts of this case countenance strongly in favor of a full, or close to full, attorneys fee award." (*Id.*)

---

[4]"[J]oint and severable" appears to be a less common term for holding parties joint and "severally" liable. The Sixth Circuit has previously used this term in recognizing liability under a contract. *Cap. Indem. Corp. v. Interstate Agency, Inc.* (*In re Interstate Agency, Inc.*), 760 F.2d 121, 123 (6th Cir. 1985) ("It bound 'the undersigned, individually' to joint and severable liability.").

The third order entered on June 26, 2019 was the "Ruling On Defendants' Objections To Plaintiffs' Ruling And Order And Proposed Final Judgment." (VM Decl., Ex. 6, Ruling On Defs.' Objs. to Pls.' Ruling and Order and Proposed Final J., Adv. No. 20-90013, ECF No. 30-1.) The state court rejected and overruled the objections made by Tolliver and the other State Court Defendants and noted that the state court "shall enter Plaintiffs' proposed *Ruling and Order Regarding Plaintiff's* [sic] *Damages* and *Final Judgment* with minor modification as the Court deems necessary." (*Id.*)

The final order entered on June 26, 2019 was the state court's "Final Judgment" against the State Court Defendants "in the amount of $1,313,011.75." (VM Decl., Ex. 7, Final J. at 2, Adv. No. 20-90013, ECF No. 30-1.) The amount of the final judgment represented "$945,417.21 in contract damages, plus $295,490.76 in attorneys' fees plus $72,103.78 in costs." (*Id.*) The final judgment also granted WLP a declaratory judgment against the State Court Defendants as follows: (1) WLP's UCC filings were held to be valid, first-priority security interests, attaching to Ashtin's accounts; (2) the documents purporting to terminate WLP's UCC filings were nullities; (3) WLP were exclusively entitled to collect on Ashtin's accounts and their proceeds; and (4) the State Court Defendants were ordered to cease all activities frustrating or interfering with WLP's UCC filings. (*Id.*)

On July 12, 2019, the state court clerk "entered the *Final Judgment* onto the judgment registry, which accounted for an 'entry' date of July 12, 2019. The [Utah] Court's clerk 'entry' was a purely clerical act and did nothing to alter the previously filed *Final Judgment*." (VM Decl., Ex. 8, Order Denying Rule 59 Mot. at 3, Sep. 16, 2019, Adv. No. 20-90013, ECF No. 30-1.)

Tolliver and the other State Court Defendants filed post-judgment motions that were all summarily denied as untimely, as well as for other reasons. (VM Decl., Ex. 10, Order of Summ. Dismissal at 1, Mar. 20, 2020, Adv. No. 20-90013, ECF No. 30-1.)

On October 2, 2019, WLP filed a post-judgment motion for Rule 11 sanctions. (*Id.* at 2.) On October 25, 2019, the state court denied WLP's motion, finding that "in light of the fact that this Court has already sanctioned the defendants—in the form of a default Judgment for over

$1.3 million – any additional sanction would be superfluous." (Ruling and Order Denying Rule 11 Mot. at 1, Adv. No. 20-90013, ECF No. 7-15.)

On October 29, 2019, Tolliver filed, pro se, a voluntary petition for bankruptcy relief under Chapter 7. (Bankr. No. 19-07024, ECF No. 1.)

On November 24, 2019, the State Court Defendants filed a "Notice of Appeal" with the Utah Court of Appeals, seeking to overturn the state court judgments. (VM Decl., Ex. 10, Order of Summ. Dismissal at 2, Mar. 20, 2020, Adv. No. 20-90013, ECF No. 30-1.)

On January 23, 2020, WLP timely filed an adversary complaint seeking to have the Utah Judgment declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) and/or (a)(6). (Compl. To Determine Dischargeability of Debt, Adv. No. 20-90013, ECF No. 1.) On February 27, 2020, Tolliver filed his answer to WLP's complaint. (Answer Of Def. David Austin Tolliver to Compl. to Determine Dischargeability of Debt, Adv. No. 20-90013, ECF No. 5.)

On March 9, 2020, Tolliver filed a motion for summary judgment asking the bankruptcy court to dismiss WLP's adversary complaint. (Mot. for Summ. J. to Dismiss the Compl. Completely, with Prejudice and to Confirm the Discharge of the Subject Debts, Adv. No. 20-90013, ECF No. 6.)

On March 20, 2020, the Utah Court of Appeals dismissed the State Court Defendants' appeal based upon a lack of jurisdiction and because it was untimely. (VM Decl., Ex. 10, Order of Summ. Dismissal at 2-3, Adv. No. 20-90013, ECF No. 30-1.)

On April 17, 2020, WLP filed a motion for summary judgment, and a memorandum in support thereof and in opposition to Tolliver's summary judgment motion. (Pls.' Mot. for Summ. J., Adv. No. 20-90013, ECF No. 30.)

On June 2, 2020, the bankruptcy court held a hearing on the competing motions for summary judgment. At the conclusion of the hearing, the bankruptcy court ruled from the bench, granting WLP's motion and denying Tolliver's motion.

On July 2, 2020, the bankruptcy court entered its Order Granting WLP's Motion for Summary Judgment and Denying Tolliver's Motion for Summary Judgment. (Adv. No. 20-

90013, ECF No. 68.)  In analyzing the state court's judgment, the bankruptcy court noted that the Sanctions Order precluded Tolliver from relitigating the issues because of his fraudulent conduct in state court.  Thus, the state court's factual findings were binding and served as the basis for the bankruptcy court's judgment.  Applying the principles of issue preclusion, the bankruptcy court determined that the debt was nondischargeable under 11 U.S.C. § 523(a)(2)(A) and/or (a)(6).

Tolliver filed his timely notice of appeal on July 10, 2020.

## DISCUSSION

There are two preclusion doctrines relevant to the case on appeal.  First "[t]he *Rooker-Feldman* doctrine provides that inferior federal courts lack jurisdiction to review the final judgments of state courts." *Hutcherson v. Lauderdale Cty., Tenn.*, 326 F.3d 747, 755 (6th Cir. 2003) (citing *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 44 S. Ct. 149 (1923)).  Secondly, the doctrine of collateral estoppel addresses when and how federal courts are to apply a state court's factual findings from a prior judgment.  Although distinct, these two doctrines work together to give full faith and credit to state court judgments. *Id.*  Because the *Rooker-Feldman* doctrine "strips federal courts of jurisdiction," it should be considered first. *Id.*  Accordingly, this Panel will first consider the *Rooker-Feldman* doctrine, and second, address the application of collateral estoppel to the Utah Judgment.

## I. *Rooker-Feldman* **Doctrine.**

In their brief, WLP assert that Tolliver's "collateral attack" on the Utah Judgment is barred by the *Rooker-Feldman* doctrine.

In *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517 (2005), the Supreme Court stated:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or

supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

*See also*, *Nathan Hake Farms, LLC, v. Simpson* (*In re Hake*), 770 F. App'x 733, 736 (6th Cir. 2019) ("*Rooker-Feldman* occupies narrow ground." (internal quotation marks and citation omitted)).

> [U]nder the *Rooker-Feldman* doctrine, lower federal courts lack subject-matter jurisdiction to hear cases that require them to review or set aside a state court judgment.  The *Rooker-Feldman* doctrine also applies in adversary proceedings in bankruptcy court as well as in the lower federal courts.  In other words, a bankruptcy court cannot act as a reviewing court for a state court issued decision.

*Ramco-Remodel Am. Corp. v. Wallis* (*In re Ramco-Remodel Am. Corp.*), 536 B.R. 213, 217 (Bankr. W.D. Tenn. 2015) (internal quotation marks and citations omitted).

On the other hand, "the *Rooker-Feldman* doctrine does not prohibit all federal cases that are somehow related to a prior state-court decision." *Hamilton v. Herr* (*In re Hamilton*), 540 F.3d 367, 372 (6th Cir. 2008) (citation omitted).  The *Rooker-Feldman* doctrine "does not prevent [federal courts] from deciding an independent claim," even if doing so requires the federal court to deny a legal conclusion the state court reached.  *Sill v. Sweeney* (*In re Sweeney*), 276 B.R. 186, 195 (B.A.P. 6th Cir. 2002) (internal quotation marks and citation omitted).  Most importantly, "the *Rooker-Feldman* doctrine provides no protection in areas where Congress has explicitly endowed federal courts with jurisdiction." *In re Hamilton*, 540 F.3d at 372 (citation omitted).

"Bankruptcy courts have exclusive jurisdiction to determine the dischargeability of the debts described in § 523(a)(2), (4) and (6) of the Bankruptcy Code." *Schafer v. Rapp* (*In re Rapp*), 375 B.R. 421, 430 (Bankr. S.D. Ohio 2007) (citing 11 U.S.C. § 523(c); *Dollar Corp. v. Zebedee* (*In re Dollar Corp.*), 25 F.3d 1320, 1325 (6th Cir. 1994) (other citations omitted)).  "Thus, under the *Rooker-Feldman* doctrine, a bankruptcy court may not review and redetermine the merits [(e.g., the existence and the amount)] of a debt or set aside the default judgment reflecting it, but it may within its exclusive jurisdiction determine whether that debt is dischargeable or not." *In re Sweeney*, 276 B.R. at 195.

Accordingly, the *Rooker-Feldman* doctrine does not bar a bankruptcy court from determining whether a state court judgment is nondischargeable pursuant to § 523(a)(2)(A) or (a)(6).

The *Rooker-Feldman* doctrine does, however, prohibit some of Tolliver's arguments on appeal. Tolliver asserts that the bankruptcy court erred in failing to address his allegation that WLP's counsel had a conflict of interest, that the Utah court ignored certain evidence, and that "[t]he Utah [J]udgment is based on fraud on the court by [WLP]." (Appellant's Reply Br. at 2-3, 10, BAP Case No. 20-8021, ECF No. 11.) Granting the relief Tolliver seeks would have required the bankruptcy court to "retry" the underlying case and redetermine liability. This is precisely what the *Rooker-Feldman* doctrine prohibits.

Thus, we reject WLP's assertion that this Panel lacks jurisdiction to decide this appeal based on *Rooker-Feldman* and we deny Tolliver's request to relitigate the Utah Judgment.

## II. Collateral Estoppel.

Collateral estoppel,[5] or issue preclusion, "prevents the relitigation of an ultimate fact that was determined by a valid and final judgment in a prior action." *CMCO Mortg., LLC v. Hill* (*In re Hill*), 957 F.3d 704, 710 (6th Cir. 2020) (citation omitted). "[F]ederal court[s] must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Id.* at 711 (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892 (1984) (other citation omitted)). This rule applies in dischargeability determinations before a bankruptcy court. *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 284, 111 S. Ct. 654 (1991) (other citations omitted)). Because the underlying judgment was entered in a Utah state court, Utah law governs.

---

[5]In *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 77 n. 1, 104 S. Ct. 892 (1984), the United States Supreme Court expressed its preference for the use of the terms "issue preclusion" and "claim preclusion" to refer to the preclusive effect of a judgment in foreclosing future litigation rather than the terms "collateral estoppel" and "res judicata."

Under Utah law,[6] the party invoking issue preclusion has the burden of proving four elements:

[1] the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication;

[2] the issue decided in the prior adjudication must be identical to the one presented in the instant action;

[3] the issue in the first action must have been completely, fully, and fairly litigated; and

[4] the first suit must have resulted in a final judgment on the merits.

*Truman v. Orem City*, 1 F.4th 1227, 1242 (10th Cir. 2021) (citing *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 965 (Utah 2008)).

In the Sanctions Order the state court ruled: "The Court STRIKES all of the Defendants' pleadings and DISMISSES all of their defenses and counterclaims WITH PREJUDICE." (Sanctions Order at 21.)   The next line of the Order states: "This Court hereby enters Defendants' DEFAULT." (*Id.*)  By striking the State Court Defendants' pleadings, all of the allegations in the complaint were "deemed admitted" under Utah law, with damages being the only remaining issue to be determined.  *Fratto v. Hensley*, No. 20080473-CA, 2009 WL 1089548, at *1 (Utah Ct. App. April 23, 2009); *see also* Utah R. Civ. P. 8(d).  Although striking the pleadings and entering the default deemed the well-pleaded allegations in the Utah Complaint to be true, for issue preclusion to apply these factual issues must have also been determined as part of a valid and final judgment.  *See Macris & Assocs., Inc. v. Neways, Inc.*, 16 P.3d 1214, 1222 (Utah 2000); *Oman*, 194 P.3d at 966 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, *whether on the same or a different claim*."  (citation omitted)).

---

[6]Utah law considers collateral estoppel to be a branch of res judicata.  *Macris & Assocs., Inc. v. Neways, Inc.*, 16 P.3d 1214, 1221 (Utah 2000) ("[T]here are two branches of res judicata, claim preclusion and issue preclusion—also known as collateral estoppel."  (citation omitted)).  Additionally, the "on the merits" inquiry under Utah law is the same for claim and issue preclusion.  *Cheek v. Iron Cty. Atty.*, 448 P.3d 1236, 1240 n.2 (Utah 2019) ("The parties do not assert that a different inquiry guides our determination of whether a judgment is 'on the merits' when addressing issue preclusion as opposed to claim preclusion. And we see no reason to draw that distinction."  (citation omitted).

Based on the Sanctions Order, the well pleaded allegations in the Utah Complaint are taken as true.  However, in the Damages Order, the state court dismissed WLP's fifth cause of action, breach of personal guarantees; sixth cause of action, fraud; and seventh cause of action, unjust enrichment.  Accordingly, issue preclusion applies to all of the incorporated findings that were part of the final judgment, except the allegations in the claims that were dismissed, namely: breach of personal guarantees,[7] fraud, and unjust enrichment.[8]

### III. Whether the Findings in the Prior Proceeding Rendered Tolliver's Debt Nondischargeable.

WLP's motion for summary judgment sought a ruling that the debt was nondischargeable under § 523(a)(2)(A) and/or (a)(6).  The Sixth Circuit has held "that exceptions to discharge in § 523(a) must be narrowly construed." *Bd. of Trs. v. Bucci* (*In re Bucci*), 493 F.3d 635, 642 (6th Cir. 2007) (citing *Meyers v. IRS* (*In re Meyers*), 196 F.3d 622, 624 (6th Cir. 1999)); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S. Ct. 974 (1998).  Accordingly, this Panel first considers whether all or part of the "Final Judgment" should be held nondischargeable as a willful and malicious injury under § 523(a)(6), and then addresses nondischargeability for false pretenses or a false representation under § 523(a)(2)(A).

### A. "Willful and Malicious Injury."

"Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt 'for willful and malicious injury by the debtor to another entity or to the property of another entity.'" *In re Hill*, 957 F.3d at 711-12.  A creditor asserting nondischargeability under § 523(a)(6) must prove that the injury was both "willful" and "malicious." *Mkt. Graphics Rsch. Grp., Inc. v. Berge* (*In re Berge*), 953 F.3d 907, 915 (6th Cir. 2020), *cert. denied* 141 S. Ct. (2021).  In many cases, facts satisfying the "willful" requirement will likewise satisfy the "malicious" requirement. *Id.* at

---

[7]The Utah court held that the guarantees applied in finding the defendants were all subject to "joint and severable liability" for the reasons stated in the Sanctions Order: "This judgment shall be joint and severable and thus, as stated previously.  In other words, the guarantors are on the hook for the company's obligations here for the reasons that I stated there." (Ex. 10, Evidentiary Hr'g at 130:11-15, Adv. No. 20-90013, ECF No. 7-10.)

[8]In dismissing the unjust enrichment claim the Utah court stated: "with respect to the unjust enrichment claim, because that was an alternative equitable claim, and we do have contracts between the parties, the claim is unnecessary, and it's dismissed." (*Id.* at 130:6-9.)

916 (citation omitted).  Notably, "§ 523(a)(6) covers debts 'for willful and malicious injury,' whether or not that injury is the result of fraud[.]" *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 363, 136 S. Ct. 1581 (2016) (citation omitted).  Therefore, a claim for willful and malicious injury that sounds in fraud fits comfortably within the contours of § 523(a)(6). *See id.*; *Grogan*, 498 U.S. at 282 n.2.

As the statutory language suggests, § 523(a)(6) excepts debts from discharge that result from "intentional torts." *Geiger*, 523 U.S. at 61.  "The word 'willful' in (a)(6) modifies the word 'injury,'" indicating that a specific intent to "injure" is required. *Id.*  "A malicious injury on the other hand can be defined, for purposes of § 523(a)(6), as that conduct which is done without just cause or excuse, or for which there is no reasonable justification." *Wurm v. Ridgway* (*In re Ridgway*), 265 B.R. 853, 857 (Bankr. N.D. Ohio 2001) (citation omitted).

"As *Geiger* emphasizes, a debtor might act intentionally but simply not know that the act will cause injury.  That is typically the case with judgments involving negligence," *Doe v. Boland* (*In re Boland*), 946 F.3d 335, 338 (6th Cir. 2020) (citation omitted), or a "knowing breach of contract." *Geiger*, 523 U.S. at 62 (citation omitted).  Therefore, to succeed in a § 523(a)(6) action, the creditor must show that the debtor knew the injury would result from his actions. *See id.*

1. The "Injury" Caused by Tolliver's "Willful" and "Malicious" Actions.

a. Attorneys' Fees and Cost for "Fraud on the Court."

The Utah court's award of attorneys' fees and costs was clearly intended to compensate WLP for Tolliver's fraud on the court.  It has been held that a defendant who falsifies records produced in discovery in an attempt to deceive his opponent and the state court is guilty of a "willful and malicious" injury under § 523(a)(6). *Spring Works, Inc. v. Sarff* (*In re Sarff*), 242 B.R. 620, 628 (B.A.P. 6th Cir. 2000).  In the case on appeal, the state court calculated the hours caused by the State Court Defendants' "perpetuation" of wrongful conduct and held that the "unique facts of this case countenance strongly in favor of a full, or close to full, attorneys fee award." (VM Decl., Ex. 5, Order on Pls.' Request for Fees and Costs at 7-8, 10, Adv. No. 20-90013, ECF No. 30-1.)  There is no genuine issue of material fact that this much of the

judgment is based upon a willful and malicious injury. *Staton Holdings, Inc. v. Mileski* (*In re Mileski*), 416 B.R. 210, 223 (Bankr. W.D.N.C. 2009). Thus, the bankruptcy court properly determined that the $295,490.76 in attorneys' fees and $72,103.78 in costs is excepted from discharge under § 523(a)(6).

b. The Complaint for Invoice-Related Damages.

Although Tolliver's prelitigation conduct was "willful" and "malicious,"[9] whether the state court damages award was attributable to traditional breach of contract damages, invoice-related damages, or a mixture of both, is unclear. *See Com. Cash Flow, LLC v. Matkins* (*In re Matkins*), 605 B.R. 62, 110-16 (Bankr. E.D. Va. 2019); *Clear Sky Props., LLC v. Roussel* (*In re Roussel*), 536 B.R. 254, 263 (Bankr. E.D. Ark. 2015), *aff'd,* 2015 WL 4779247 (E.D. Ark. Aug. 14, 2015), *aff'd*, 829 F.3d 1043 (8th Cir. 2016); *Yust v. Henkel* (*In re Henkel*), 490 B.R. 759, 783 n.14 (Bankr. S.D. Ohio 2013). Based upon a de novo review of the bankruptcy court record and judgment, neither WLP nor Tolliver established their entitlement to summary judgment on the state court damages award.

The party invoking issue preclusion must provide a sufficient record of the prior proceeding to allow a determination that the requirements of issue preclusion have been met. *See Andreason v. Felsted*, 137 P.3d 1, 3 (Utah Ct. App. 2006); *cf. In re Sweeney*, 276 B.R. at 194. Here, the record does not reflect the extent to which the state court found that Tolliver's willful and malicious actions resulted in specific awards of damages.

WLP did not provide a full transcript of the hearing the state court held to determine the invoice-related damages. The evidentiary hearing on damages appears to have been long and detailed and involved expert testimony. The transcript excerpts that were submitted show that they are part of a total of 133 pages. (Pls.' Resp. to Def.'s Statement of Undisputed Material

---

[9] A factual allegation in WLP's fraud cause of action in the Utah Complaint asserts Tolliver's conduct as "willful and malicious." (Utah Compl. at ¶110.) As discussed above, this factual allegation cannot be given preclusive effect because the Utah Judgment was not based on this allegation and this claim was ultimately dismissed by the state court. However, the incorporated factual allegations in the first, second, third, fourth and eighth claims of the Utah Complaint that the state court entered judgment establish "willful and malicious" conduct. (Utah Compl. at ¶¶1-94, 116-124.)

Facts at ¶8, Adv. No. 20-90013, ECF No. 29.) Only twenty pages of the hearing transcript were submitted to the bankruptcy court.

The record also reflects that there are genuine issues of material fact that preclude summary judgment on nondischargeability. For example, in the transcript excerpts that were provided, a distinction is drawn in a colloquy between the Utah court and WLP's witness during the evidentiary hearing on damages. At this hearing, the court picked up on the witness's reference to "fraudulent" invoices and "not good" invoices. In a two-page portion of the damages hearing transcript that Tolliver filed as part of the record,[10] WLP's witness, Mr. Capooth, described problems with the C.H. Robinson invoices: "What we came to find out is much of those receivables were not good. Either Ashtin had not committed or done the work, or he had fraudulently manipulated the invoice to show a different carrier, his carrier, or a different amount." (Ex. 6, Evidentiary Hr'g at 55:4-55:7, Adv. No. 20-90013, ECF No. 45-6.) The Utah court asked: "you said some of the receivables were not good. Then you said some of them seemed to use the word 'fraudulent.' I mean, that's a strong word. What do you base that on?" (*Id*. at 55:17-55:20.) Mr. Capooth then described what he meant by "fraudulent" invoices, but he did not address what he meant by his statement that "some" of the invoices were "not good," nor did he outline what the difference was between "not good" invoices and the "fraudulent" invoices.

In addition, while there is evidence that the estimated $260,000.00 (Utah Compl. at ¶50) in alleged damages arising from "fraudulent" invoices is the same $260,079.05 reflected in the C.H. Robinson "spreadsheet" (Utah Compl. at Ex. 6), none of the state court's findings specifically reference this amount. The Damages Order does award $26,007.91, stating: "The invalid invoice fee of $26,007.91 is based on ten percent of the C.H. Robinson bounced loads." (Damages Order at 3.) But viewing the evidence in the light most favorable to Tolliver, and the Utah court's question regarding the distinction between fraudulent invoices and "not good"

---

[10] Tolliver cited to these two pages of the transcript of the Utah evidentiary hearing on damages to show that Mr. Capooth did not have personal knowledge regarding the invoices at issue, and that the state court was wrong in allowing and relying on that testimony. As previously discussed, the *Rooker-Feldman* doctrine prohibits this Panel from serving as a state appellate court. Accordingly, the specific argument Tolliver raised with respect to this exhibit is rejected.

invoices, the Panel finds that under the standard for summary judgment, the evidence for judgment on even these amounts fell short in the bankruptcy court proceedings.

Moreover, in the initial complaint filed in the Utah court, WLP alleged that they had purchased a mixture of receivables, some were legitimate and some were fraudulent. (Utah Compl. at ¶2.) The complaint asserted that Tolliver and the other State Court Defendants attempted to frustrate WLP's efforts to collect on "legitimate" invoices. (*Id.* at ¶2.) In the Utah Complaint, WLP alleged that the damages arising from the "fraudulent" invoices was "approximately $260,000."[11] (*Id.* at ¶50.) But, WLP alleged that the total amount owed was "approximately $500,000."[12] (*Id.* at ¶53.) The state court entered judgment on the invoice-related claims in the amount of $945,417.21, an amount in excess of what appears to have been initially requested in the Utah Complaint.

The Receivables and Future Receivables Agreements between WLP and Ashtin/Tolliver contain a number of liquidated damages[13] provisions.[14] However, the orders and judgments

---

[11]WLP attached a spreadsheet to the Utah Complaint that identified and listed all of the invoices WLP asserted were "fraudulent." These invoices total $260,079.05. The specific defect for each invoice is listed under the heading "Status from Navispehere [sic]." (Utah Compl. at Ex. 6.) Tolliver filed a list of aged accounts receivables with a heading "Transfac Capital Inc. INVOICE AGING REPORT" ("Aging Report") and the total amount of unpaid invoices on the Aging Report appears to be $431,914.42, labeled "Relation Totals." (Def.'s Resp. to Pls.' Statement of Undisputed Material Facts, Ex. 18 at 13-16, Adv. No. 20-90013, ECF No. 45-18.) The accounts asserted to be "fraudulent" in the Utah Complaint all appear on the Aging Report, but there are additional unpaid invoices listed on the Aging Report which were not part of WLP's fraudulent invoice list. Tolliver also filed a list of what appears to be all the factored accounts receivable WLP purchased from Ashtin, and/or from a previous factoring company, totaling $1,108,300.94, with a heading "Transfac Capital Inc. PURCHASES & ADVANCES REPORT." The allegedly fraudulent accounts all appear on this report as well, but the report includes additional invoices that appear to have been paid and which were not part of the fraudulent invoice list, nor were most of these receivables listed on the Aging Report. (Def.'s Resp. to Pls.' Statement of Undisputed Material Facts, Ex. 19, Adv. No. 20-90013, ECF No. 45-19); (Def.'s Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, Ex. 5, Adv. No. 20-90013, ECF No. 7-5.)

[12]WLP's prayer for relief in the State Court Complaint requested an "award of money damages in favor of Plaintiffs and against Defendants totaling not less than $485,876.11." (Utah Compl. at 24.)

[13]The Receivables Agreement was a "Recourse" agreement, which meant Ashtin was required to repurchase any account purchased by WLP if the account remained unpaid for any reason after ninety days. The allocation of damages between invoices that remained unpaid after ninety days and "fraudulent invoices" is unclear. The amounts WLP advanced for the fraudulent invoices and the "factoring fees" for the face value amounts in the fraudulent invoices are likely nondischargeable. However, this Panel does not know what fees in the Receivables Agreement and/or the Futures Receivables Agreement were triggered through the submission of the fraudulent invoices. *See e.g.*, *Com. Cash Flow, LLC v. Matkins* (*In re Matkins*), 605 B.R. 62, 110 (Bankr. E.D. Va. 2019) (evaluating whether the nondischargeable debt includes the "(1) 'factoring fees' pursuant to Section 2.6 of the

entered by the Utah court do not state how those contractual provisions were applied to the fraudulent invoices, the "legitimate" invoices, or whether the damages enhancement was based on other factors, like wrongful (but unsuccessful) attempts to terminate WLP's perfected security interests.

Moreover, while this Panel is charged with reviewing the bankruptcy court's judgment de novo, that does not mean that we are required to ignore the fact that we are an appellate panel. Because the bankruptcy court's judgment cannot be affirmed in full, any piecemeal judgment of nondischargeability that this Panel might enter would probably not be the final word. The issue of the final amount of nondischargeable damages, other than the discrete "fraud on the court" sanctions, has to be remanded for additional findings. In dealing with those issues, the bankruptcy court may, or may not, receive the full transcript of the actual basis for the Utah court's calculation of damages. The bankruptcy court should not be constrained by a partial affirmance on the invoice damages that could be contradicted by a transcript that apparently exists, but was not made part of the record.

In sum, the record from the Utah court proceedings that was before the bankruptcy court does not reflect the fact-intensive assessment required for § 523(a)(6) nondischargeability determinations on summary judgment. *See e.g.*, *In re Henkel*, 490 B.R. at 782-83 (collecting cases holding that a judgment's failure to explain what findings led to the damages means the judgment cannot be afforded preclusive effect). Thus, viewed in the light most favorable to the

---

Factoring Agreement; (2) a 1% late fee under Section 5.4 of the Factoring Agreement; (3) a 3% APR interest charge in accordance with Section 5.5 and the default provisions in Section 10 of the Factoring Agreement.").

[14]In addition to the "invalid invoice fee of $26,007.91" the Damages Order awards $499,991.52 as a "default fee." The state court notes that this fee was "high," but was "substantiated by the admitted evidence and testimony" at the evidentiary hearing. (Damages Order at 3.) As mentioned above, only twenty pages of the 133 pages of this "evidence and testimony" was made part of the record. Additionally, the "Final Judgment" includes the full amount of $29,076.96 from the Futures Receivables Agreement. (*Id.*) That amount is calculated by reducing the amount paid ($53,992.92) by WLP, by the "amounts received (i.e., $24,923.04)." (*Id.*) It is not clear that the $29,076.96 difference is a result of Tolliver's willful and malicious conduct in selling "fraudulent invoices." The only reference to fraud damages prior to the state court entering its orders and judgments is during the evidentiary hearing on damages where the state court indicated the following: "The Court is not addressing the fraud claim because it doesn't need to, because the damages would be the same." (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts at ¶11, Adv. No. 20-90013, ECF No. 29.) This is insufficient for a determination of nondischargeability on summary judgment. *Andreason v. Felsted*, 137 P.3d 1, 3 (Utah Ct. App. 2006); *cf. Sill v. Sweeney* (*In re Sweeney*), 276 B.R. 186, 194 (B.A.P. 6th Cir. 2002).

nonmoving party, there appear to be genuine issues of material fact as to what portion, if any, of the damages set forth in the Damages Order "arose from"[15] Tolliver's willful and malicious conduct. *See Murphy v. Snyder* (*In re Snyder*), 939 F.3d 92, 103 (2d Cir. 2019) (citing *Superior Cleaning Serv., LLC v. Munoz* (*In re Munoz*), 592 B.R. 736, 744-45 (D. Colo. 2018) (affirming bankruptcy court's decision to separately consider nondischargeability of each portion of the judgment), *aff'd*, 784 F. App'x 653 (10th Cir. 2019)).

As previously noted, the party invoking issue preclusion bears the burden of establishing its elements. *See Timm v. Dewsnup*, 851 P.2d 1178, 1184 (Utah 1993) (citation omitted). Notwithstanding WLP's failure to carry their burden, Tolliver likewise failed to make a showing that the injury did not result from his intentional conduct. He asks this Panel to "infer" from the record that the damages are dischargeable because the judgment was not based on the State Court Complaint's fraud claim, which was dismissed. However, we still look at the underlying facts to determine nondischargeability. *Old Republic Title Co. of Tenn. v. Looney* (*In re Looney*), 453 B.R. 252, 258-59 (B.A.P. 6th Cir. 2011) (citing *Archer v. Warner*, 538 U.S. 314, 321-23, 123 S. Ct. 1462 (2003); *Brown v. Felsen*, 442 U.S. 127, 138, 99 S. Ct. 2205 (1979)); *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir. 1981).

Based on the foregoing, both parties failed to meet their burden on summary judgment. Accordingly, the bankruptcy court's grant of summary judgment as to the invoice-related damages ($945,417.21) under § 523(a)(6) is vacated and remanded to determine to what extent the damages arose from Tolliver's "willful and malicious" conduct.

---

[15]In *Cohen v. de la Cruz*, the Supreme Court held, in the context of § 523(a)(2), that all damages arising from a debtor's conduct, including punitive damages, fees, and interest, are nondischargeable. 523 U.S. 213, 218, 118 S. Ct. 1212 (1998). *Cohen* noted the structure of § 523(a), where subsection (a) ends with "debt" and the numbered subsections below all start with the word "for." *Id.* at 219-20. "Because each use of 'debt for' in § 523(a) serves the identical function of introducing a category of nondischargeable debt, the presumption that equivalent words have equivalent meaning when repeated in the same statute has particular resonance here." *Id.* at 220 (citation omitted). *Cohen* also notes that the term "'debt for' is used throughout to mean 'debt as a result of,' 'debt with respect to,' 'debt by reason of,' and the like." *Id.* Subsequent decisions have extended the holding in *Cohen* to actions under § 523(a)(6), making damages "arising from" debtor's willful and malicious conduct nondischargeable. *See Perry v. Judge* (*In re Judge*), 630 B.R. 338, 346 n.46 (B.A.P. 10th Cir. 2021); *Monsanto Co. v. Trantham* (*In re Trantham*), 304 B.R. 298, 309 (B.A.P. 6th Cir. 2004); *McCallum v. Pixley* (*In re Pixley*), 504 B.R. 852, 870 (Bankr. E.D. Mich. 2014); *HER, Inc. v. Barlow* (*In re Barlow*), 478 B.R. 320, 333-34 (Bankr. S.D. Ohio 2012), *aff'd*, 501 B.R. 685 (B.A.P. 6th Cir. 2013).

**B. "False Pretenses" and "False Representation."**

"Section 523(a)(2)(A) excepts from discharge 'any debt . . . for money, property, services, or . . . an extension, renewal, or refinance of credit, to the extent obtained by . . . false pretenses, [or] a false representation.'"**[16]** *Kraus Anderson Cap., Inc. v. Bradley* (*In re Bradley*), 507 B.R. 192, 205 (B.A.P. 6th Cir. 2014) (quoting 11 U.S.C. § 523(a)(2)). A creditor bears the burden of proving by a preponderance of the evidence that:

(1) the debtor obtained money [or an extension, renewal, or refinancing of existing credit] through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

(2) the debtor intended to deceive the creditor;

(3) the creditor justifiably relied on the false representation; and

(4) its reliance was the proximate cause of the loss.

*Id.* (citing *Rembert v. AT & T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 280-81 (6th Cir. 1998) (other citations omitted)).

Under "§ 523(a)(2)(A) false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Baker v. Wentland* (*In re Wentland*), 410 B.R. 585, 594 (Bankr. N.D. Ohio 2009). A "false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression." *Coughlin Chevrolet, Inc. v. Thompson* (*In re Thompson*), 458 B.R. 409, 421 (Bankr. S.D. Ohio 2011) (citations omitted).

WLP did not set forth in their bankruptcy court complaint the individual elements of a § 523(a)(2)(A) cause of action. Instead, they alleged generally that the debt, in the full amount of $1,313,011.75, "was obtained by false pretenses through [Tolliver's] submission of fraudulent accounts" and is thus nondischargeable under § 523(a)(2)(A). (Compl. To Determine

---

**[16]**WLP allege "false pretenses" and "false representation," not "actual fraud." (Compl. To Determine Dischargeability of Debt at ¶¶29-32, Adv. No. 20-90013, ECF No. 1.) WLP's bankruptcy court complaint alleges the debt "was also obtained by false representations through [Tolliver's] fraud upon the court" by "altering bank records to make it appear that monies he received from [WLP] had been reversed and thus not appropriately credited to [Tolliver's] account." (*Id.* at ¶31.) Because we affirm the bankruptcy court's finding that the costs and attorneys' fees awarded as a fraud on the court sanction are nondischargeable under § 523(a)(6), this Panel does not address the dischargeability of the costs and attorneys' fees under § 523(a)(2)(A).

Dischargeability of Debt at ¶31, Adv. No. 20-90013, ECF No. 1.) WLP makes the same assertion in their appellee brief, citing *Cohen,* 523 U.S. at 218.[17] For the reasons set forth below, the facts that are properly given preclusive effect do not establish, on summary judgment, that the debt arising from the sale of Ashtin's invoices is nondischargeable under § 523(a)(2)(A).

          1. Justifiable Reliance.

Based on the record that was before the bankruptcy court, there is a genuine issue of material fact as to whether WLP justifiably relied on Tolliver's misrepresentations. Section "523(a)(2)(A) requires justifiable, but not reasonable, reliance" on a debtor's misrepresentations. *Field v. Mans*, 516 U.S. 59, 74-75, 116 S. Ct. 437 (1995) (citation omitted). Although "justifiable reliance" and "reasonable reliance" are closely related terms, the former is a less demanding level of reliance. *Id.* The Ninth Circuit Court of Appeals, in a case that was cited favorably by the Supreme Court in *Field v. Mans*, explained that "justifiable reliance" is a subjective standard that takes into account a variety of factors, such as "special knowledge, experience, and competence[.]" *Eugene Parks L. Corp. Defined Benefit Pension Plan v. Kirsh* (*In re Kirsh*), 973 F.2d 1454, 1458 (9th Cir. 1992). Therefore, "[i]n considering justifiable reliance, the court may consider the sophistication of the creditor and the parties' past relationship." *Lawson v. Conley* (*In re Conley*), 482 B.R. 191, 209 (Bankr. S.D. Ohio 2012) (citing cases).

None of the state court's findings that are entitled to preclusive effect affirmatively established "justifiable reliance" on behalf of WLP for the balance of the debt,[18] nor is there any other record evidence to support a finding of justifiable reliance. It is the creditor's burden to prove the elements under § 523(a)(2)(A). *In re Rembert*, 141 F.3d at 281. As a result, a genuine issue of material fact exists with respect to whether WLP met their burden of proving "justifiable

---

[17]Generally, the amount of any nondischargeable debt includes "all liability arising from" the nondischargeable fraudulent conduct, including "treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." *Cohen*, 523 U.S. at 218, 223 ("[T]he share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt.").

[18]The factual allegations in WLP's fraud cause of action in the Utah Complaint do assert WLP's reliance on the misrepresentations. (Utah Compl. at ¶¶107-08.) However, as discussed above, these factual allegations cannot be given issue preclusive effect because the state court judgment was not based on those allegations and that claim was ultimately dismissed by the state court.

reliance" under § 523(a)(2)(A) at the summary judgment stage of the proceedings before the bankruptcy court.

Moreover, the record suggests a genuine issue of material fact exists with respect to this element. Viewing the evidence in the light most favorable to Tolliver, WLP, as businesses engaged in factoring accounts, are sophisticated creditors. At the evidentiary hearing on damages in state court, WLP's witness testified that "you could tell" what invoices "were doctored" with "whiteout" to "change the carrier," and "you could blatantly see [] where post-it notes were used to hide information" on invoices that were scanned and sent to WLP. (Ex. 6, Evidentiary Hr'g at 55:21-24, 56:1-3, Adv. No. 20-90013, ECF No. 45-6); (Pls.' Resp. to Def.'s "Statement of Additional Undisputed Material Facts" at 17-18 Adv. No. 20-90013, ECF No. 50.) These facts are sufficient to show that there is a genuine issue with respect to WLP's "justifiable reliance." *See also,* (Pls.' Resp. to Def.'s Statement of Additional Undisputed Material Facts at ¶¶63-68, 67-71.)

Accordingly, the bankruptcy court's grant of summary judgment as to the nondischargeability of the balance of the damages under § 523(a)(2)(A) is vacated, and the issue of the dischargeability of the $945,417.21 as a result of Tolliver's "false pretenses" is remanded to the bankruptcy court for further proceedings.

## CONCLUSION

For the reasons set forth above, we AFFIRM the grant of summary judgment on nondischargeability as to the judgment based on Tolliver's fraud on the court consisting of $295,490.76 in attorneys' fees plus $72,103.78 in costs under § 523(a)(6). We VACATE the grant of summary judgment for the invoice-related damages of $945,417.21 under § 523(a)(6). We VACATE the grant of summary judgment for the $945,417.21 under § 523(a)(2)(A). We REMAND for further proceedings consistent with this opinion.